| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | | SOUTHERN DISTRICT OF TEXAS |

Kenyon International Emergency §
    Services, Inc. §
           §
    Plaintiff, §
           §
versus            §    Civil Action H-09-3550
           §
Mark Malcolm, et al., §
           §
    Defendants. §

## Opinion on Denial of Injunction

1. *Introduction.*

After several of its occasional contractors resigned, Kenyon now seeks to enjoin them from competing against it. The injunction will be denied.

2. *Background.*

Kenyon International Emergency Services is a business that responds to mass casualties. When an accident causes several fatalities, companies like Kenyon recover bodies, counsel families, answer questions, and manage the client's public relations. Kenyon also writes plans and trains clients in responding to emergencies.

Kenyon primarily responds with people who are independent contractors. They function as stand-by employees, holding full-time jobs elsewhere. Kenyon retains people who are already experienced in their fields. They include coroners, therapists, and nurses.

Kenyon seeks to enjoin the defecting workers from competing against it, soliciting current or former Kenyon employees, disclosing or using its information, and trading on its goodwill. To blur the facts and make the case seem more complicated, Kenyon, with sparse facts, has sued eight people with different qualifications, assignments, and contracts.

3. *Mark Malcolm and Disaster.*

Mark Malcolm is a coroner in Little Rock, Arkansas. He has managed multiple-fatality accidents since 1989. He was an independent contractor for Kenyon from 2005 to 2008. Before working for Kenyon, Malcolm worked on domestic incidents with one to four fatalities caused by fires, car wrecks, and other accidents.

His experience for Kenyon includes morgue operation in Thailand after a tidal wave, coordination of body recovery in New Orleans after a hurricane, and morgue operation and recovery coordination after a helicopter crash in Peru.

Malcolm founded Disaster Management International Corporation in Little Rock, Arkansas. He is the president, and Mara Malcolm is the secretary. They are the only officers. Its owners are Mark Malcolm, Walton Taylor, Bryan O'Neal, and JH Enterprises. In 2008, Malcolm coordinated the family-assistance response for a crane collapse at a refinery in Houston for Disaster.

4. *Grady Bray and Bray Associates.*

Grady Bray is a psychologist in Huntsville, Texas, who specializes in disaster- and emergency-response counseling. He earned his doctorate from the University of Georgia in 1974 and taught for seven years at the University of Rochester Medical School. Since 1984, he has been the owner-president of Bray Associates; it trains and advises governments and businesses. Bray began working for Kenyon in 2000. From 2002 to 2006, he was a vice president. He also worked part-time as a contractor in 2008 and 2009.

Bray had experience and expertise in disaster counseling before working for Kenyon; he responded to six airplane crashes, three floods, three hurricanes, two earthquakes, and the Oklahoma City bombing. He has also published about mass-fatality and emergency-services stress in the late 1980s and early 1990s.

5. *Ronald Crane.*

Ronald Crane is the manager for emergency preparedness at the University of Arkansas for Medical Sciences. He teaches about emergency responses at the Arkansas Department of Emergency Management. He also works in similar capacities for the Department of Homeland Security and the fire department in Cammack Village, Arkansas.

Because of his experience, Kenyon employed Crane to develop plans for handling mass-fatalities for hospitals in Arkansas and Nevada. Crane worked 27 days for Kenyon for compensation of $3,393.75. The last day Crane worked for Kenyon was August 10, 2008.

6. *The Other Five.*

For Kenyon, Kathy Rock wrote manuals and trained clients. She began in July 2004, and her last training ended on July 21, 2009. From January 2005 to June 2006, she was a full-time trainer for Kenyon. With the exception of three courses in Canada, Rock has worked exclusively in Houston. For all of her work, Kenyon has paid her $72,441.25.

As a nurse, Leah Hawley responded to disasters and trained clients for Kenyon between January 2004 to January 2006. In that span, she worked on six projects in three states and Thailand. Her aggregate compensation was $18,325.

James Fairbrother worked for Kenyon in 2005. He was assigned to three projects, each time as a finance manager. He was compensated $19,275.

Sharon Fairbrother worked for Kenyon for two months in the summer of 2005. She was a manager at a family assistance center in Texas and then in Louisiana. Kenyon paid her $12,600.

Marjorie Bray first worked for Kenyon in January 2004. Her last assignment ended on May 31, 2009. She is a grief counselor who also teaches clients about coping with mental-health issues after disasters. In her work for Kenyon, she traveled to several cities abroad and even more in the United States. Her compensation totaled $41,476.31.

7. *Conflict.*

In May 2009, Kenyon agreed that Disaster could also respond to mass casualties. In October, however, Kenyon sued Malcolm, Crane, Bray, Disaster, Bray Associates, and Crisis Human Services for competing and using confidences. The state court temporarily restrained them on October 12. On October 22, it compelled arbitration but denied Kenyon's request for an injunction during arbitration.

On November 3, Kenyon nonsuited its case. On the same day, it sued in federal court. To the original defendants, it added Hawley, Rock, the Fairbrothers, and Marjorie Bray. After the initial conference in federal court, Kenyon abandoned its claim against Crisis Human

Services. On November 4, this court issued a temporary injunction and ordered Kenyon to disclose its data supporting the complaint.

The parties mediated but failed to settle. After hearings on November 24 and December 2, the court declined to continue its preliminary injunction.

8.   *Injunctions.*

A court has discretion whether to employ an extraordinary remedy in equity like an preliminary injunction. Among other things, these inform the court's judgment: (a) whether the party has a legally-protected interest that is likely to be harmed irreparably without an injunction; (b) whether that party will probably succeed in establishing its case; (c) whether an injunction might inflict unjustifiable harm that on unrepresented people; and (d) whether the harm to the defendant is commensurate to the benefit to the plaintiff.   *Deckert v. Independence Shares Corp.*, 311 US 282, 291 (1940); *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

9.   *Competition.*

Using two contracts, Kenyon seeks to enjoin Malcolm, Crane, Marjorie Bray, Rock, and Grady Bray from competing against Kenyon. Its pleadings ask the court to enforce the agreements as they are written or to enforce them in a more limited territory and time. In all of its appearances, Kenyon never argued for reformation or suggested limitations, until, that is, after the court rendered its denial of an injunction.

Contracts that reasonably restrict competition after the worker leaves his employment can achieve important economic benefits to both employer and employee as well as the economy generally. Texas law allows those contracts that are crafted to protect an actual investment interest in human and intellectual capital. Tex. Bus. & Com. Code Ann. § 15.50 (a) (Vernon 2002).

Covenants not to compete encourage business growth by protecting the employer's investment in human capital. Reciprocally, they allow workers to acquire training and experience that improve their value to employers - current and future. *See* Paul H. Rubin and Peter Shedd, *Human Capital and Covenants Not to Compete*, 10 J. Legal Stud. 93 (1981). When they have a reasonable scope, they do not impose disproportionate limits on the employee or public, and the consequences are increased productivity for both parties and their economy.

Eric A. Posner, Alexander Triantis, and George G. Triantis, *Investing in Human Capital: The Efficiency of Covenants Not to Compete* 24 (University of Virginia John M. Olin Program in Law and Economics Working Paper Series, Working Paper 11, 2004). *See Consultants & Designers, Inc. v. Butler Service Group, Inc.*, 720 F.2d 1553, 1559-60 (11th Cir. 1983).

  A. *Malcolm, Crane, Rock, and Marjorie Bray.*

Malcolm, Crane, and Marjorie Bray signed standby agreements when Kenyon first recruited them. Rock did not. The agreements endured until either party cancelled on thirty-day's notice. In them, the consultants committed to join Kenyon's work at an accident or training when it called them. When they were needed, the consultants were sent an activation contract that specified the type of work, duration of assignment, and rate of compensation.

Kenyon did not pay these consultants to be ready nor promise ever to activate them. It did not train them; rather it found qualified people whom it might need. These agreements gave the consultants a sense of obligation without a corresponding benefit from Kenyon. People standing-by were essentially an address book of whom Kenyon could call when the need arose. Like holding a seminar about Kenyon's work for people who might be interested in joining it for a project, these were recruitment public relations. They were not contracts. In the absence of a binding obligation or other reciprocal exchange, Kenyon cannot enforce the unilateral promises of the consultants. When Kenyon agreed to similarly "standby" for a potential client, it required a cash payment.

Malcolm, Crane, Marjorie Bray, and Rock signed activation agreements. In them, the consultants agreed not to compete against Kenyon until one year had elapsed after the end of the activation or of "any client contract." Despite a year's lapse since the employee last worked for Kenyon, the restriction prohibits the employee from working with a former Kenyon client until the its relationship with Kenyon has ceased for a year. The restriction applies to all clients - even those the employee did not serve.

  (1) *Facts for Two.*

On Kenyon's evidence, Rock and Marjorie Bray are not competing against it. Neither Marjorie Bray nor Rock is working for a Kenyon client or competitor. Whatever their secret intentions may be, they are not known, and their private wishes are no ground for restricting

them now. Kenyon assumes that because they worked closely with Grady Bray and resigned from Kenyon, they must now be competing against it. Using assumptions instead of evidence, Kenyon attacked everyone. Kenyon has shown no fact for the substantive claim against them, and it has supported no basis for an injunction under the contract or in aid of anything else.

> (2)   *Covenants Not to Compete.*

The noncompetition clause is unenforceable because it is too broad in all respects: it does not limit the area, the tasks, or the time that it prohibits its employees from competing with it. *See* Tex. Bus. & Com. Code Ann. § 15.50 (a) (Vernon 2002).

In the activation agreement, the clause is worldwide. Under it, former employees must not work or solicit business–from current, former, or potential clients. It bans all work that competes with Kenyon, even though the employee may have worked on one recovery or delivered a single lecture. An employee who recovered bodies in Louisiana, for example, would be prevented from taking a job teaching in Oregon. Texas law requires restrictions after employment to be limited to a narrow area. Kenyon's clause does not attempt to narrow the locations it prohibits employees from working. For this reason alone, it is unenforceable.

The scope of the forbidden activity is also too broad. Kenyon's restriction prohibits its employees from doing things for others that they did not do at Kenyon and from working in the areas of their own pre-existing accomplishment. A former Kenyon coroner, then, would be prevented from responding to mass-fatalities as he did before joining Kenyon and from counseling or training as well. Texas law requires non-competition clauses to reasonably limit the scope of prohibited activity; Kenyon's does not.

Also, a company may not reasonably restrict an employee from performing a trade with the skill and qualifications he already had before joining it. Kenyon sought people like the defendants precisely because they had the specific abilities that it needed. In neither situation does Kenyon have an investment to protect.

Finally, Kenyon's definition of client is unreasonable. It encompasses nearly the whole potential field, and it does it for too long. This covenant obliges Kenyon's employees to avoid work with current, past, or potential clients. The agreement attempts to limit the time the employee cannot compete (a) to one year after the employee's job has ended or (b) to one year after the client's contract has terminated — whichever is longer. Given Kenyon's client definition, the latter restraint is indefinite. Kenyon says its clients include entities for whom

it stands-by but may never perform work. In the case of an emergency, the business or government is not obligated to employ Kenyon; it simply pays to retain Kenyon if needed. Because a customer may always retain Kenyon on stand-by for its emergencies, this provision could restrict a former-employee's ability to compete with Kenyon indefinitely. Clients may, of course, eventually leave Kenyon, but years may elapse before this occurs. For lack of a limited period, the clause is unenforceable.

On each measure, the noncompetition clause in the activation agreements is unenforceable, because it is far more restrictive - by territory, type, and time - than would reasonably protect Kenyon's legitimate interest.

(3) *No Injunction.*

After the court rendered its denial of an injunction, Kenyon asked the court to reform the time of the restriction to the earlier of one year or the life of the suit. Kenyon did not present evidence of the duration of noncompetition needed to protect its investment. It offered no data from which the court could ascertain an investment nor could the court ascertain the rate of decay of information that workers acquired. Nevertheless, supposing reformation as Kenyon desires, the covenant has expired against Malcolm and Crane. Malcolm's last assignment ended April 30, 2008. Crane's last assignment ended on August 31, 2008. Over one year has elapsed since either worked for Kenyon.

The court will not reform the clause for Rock or Marjorie Bray because even if it did, Kenyon has not demonstrated that an injunction is necessary. Since Kenyon has not shown that Marjorie Bray or Rock are competing or intend to compete against it, Kenyon is unlikely to prove they are violating the restriction on competition. Without a substantial likelihood that Kenyon will prevail on the merits or that imminent harm exists, no injunction will be issued. *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

Finally, Kenyon has not demonstrated to the court that an award of monetary damages would be insufficient if Malcolm, Crane, Bray, or Rock worked for another company. Without the threat of irreparable harm, they may not be enjoined. Id.

B.     *Grady Bray.*

On October 4, 2006, Bray became an independent consultant for Kenyon. He agreed that neither Bray Associates nor he would compete for Kenyon's clients while he was

consulting for Kenyon. Bray's contract expired on September 30, 2009. The agreement did not extend the restriction past the term he had been retained. According to their agreement, Bray was free to compete against Kenyon after September 30, 2009.

On June 1, 2006, Bray also signed a service agreement to teach two training programs for Kenyon. It was a nonexclusive engagement, and in it Bray agreed not to divert Kenyon's existing clients. The restriction against competition was only for the period of Bray and Kenyon's relationship. In the event the agreement was still in effect, Kenyon's suit certainly terminated their relationship with Bray. Because the engagement has ended, Bray is free to compete.

Because both agreements containing covenants not to compete have ended, Kenyon has no restriction to enforce against Bray. No injunction against Bray's competition may be issued.

10. *Kenyon Employees.*

Kenyon seeks to enjoin Malcolm, Crane, and Bray from soliciting its employees. The court will not enjoin Malcolm, Crane, or Bray from soliciting Kenyon's employees, because their agreements have expired.

A. *Malcolm and Crane.*

The activation contract of Malcolm and Crane says, "Team Member shall not actively or passively solicit for employment purposes, attempt to recruit, or hire directly, through third parties or for third parties any other Team Member of [sic] employee of Kenyon." Kenyon seeks to prevent Malcolm and Crane from ever soliciting its employees. This restriction is unenforceable in Texas because its duration is indefinite.

To reform it, the court could import a one-year limitation from the termination of the employee's relationship with Kenyon. Over a year has elapsed since Malcolm and Crane last worked for Kenyon. Thus, even a reformed the contract would allow Malcolm and Crane now to solicit Kenyon employees.

B. *Grady Bray.*

Bray's consultant agreement limits Bray's ability to solicit Kenyon employees. According to the consultant agreement, Bray's duty not to solicit was only for "as long as [he]

remains a consultant." Bray's consulting contract ended September 30, 2009, making him free to solicit Kenyon employees.

11. *Information.*

Kenyon says all eight defendants are misappropriating its confidential and proprietary information. It has asked for an injunction against all.

    A.    *Malcolm, Crane, Rock, Hawley, Marjorie Bray, James Fairbrother, and Sharon Fairbrother.*

Nothing shows that Crane, Rock, Hawley, Marjorie Bray, James Fairbrother, Sharon Fairbrother, or Malcolm are using or have Kenyon information.

As a professor and career-long emergency manager, Crane is an expert in emergency-services. For Kenyon, his only task was to write two mass-fatality plans. Kenyon hired Crane for the knowledge that he brought with him; Kenyon did not teach Crane while he was with it. More important, Kenyon has not shown the court that Crane - in his brief tenure - took Kenyon's information or is using its information now.

Kenyon has not demonstrated that Rock, Hawley, Marjorie Bray, or the Fairbrothers took information or are using information taken by others. Worse, Kenyon's sole means of binding Hawley and the Fairbrothers are the stand-by contracts that are unenforceable for lack of consideration.

Kenyon has not demonstrated that Malcolm took or is using Kenyon's materials. In the hearing, Kenyon conceded that recovery manuals - that may lack the detail of Kenyon's - are freely available on the internet. Kenyon says Malcolm cannot run a recovery business without manuals and procedures similar to its and that Disaster has not had enough time to develop its own manuals. The court cannot issue an injunction on Kenyon's evaluation of its assumptions about Malcolm and his future clients. If Malcolm cannot do the work, he will not get the jobs.

    B.    *Grady Bray.*

Kenyon seeks to enjoin Bray from using the PowerPoint® presentations he developed for Kenyon. The presentations contain its photographs of disasters. In the consultant

agreement, Kenyon gave Bray permission to use all materials he developed while working for it. Bray has agreed to return all of Kenyon's photographs whatever the status of their title.

Because the contract allowed Bray to use the materials he developed at Kenyon, Kenyon's only viable misappropriation claim is against the photographs. Since Bray has agreed to return them, there is no longer a threat of harm to enjoin.

Should Bray continue to use the photographs, damages are sufficient compensation. The photographs are of locations and operations after disasters, like hurricanes. While their unauthorized use may violate Kenyon's copyright, Kenyon has not demonstrated that their use will likely expose it to irreparable harm. Use of the photographs will not cause Kenyon irreparable injury, because it could be compensated with damages approximating the photographs' royalty rate.

### C. No Injunction.

Against Malcolm, Crane, Rock, Hawley, Marjorie Bray, James Fairbrother, and Sharon Fairbrother, Kenyon has only asserted speculative injury. Because Kenyon has no evidence that they took, are using, or intend to use its information, Kenyon has not demonstrated a likelihood of an injury, must less an irreparable one. Without factual support for a likely irreparable harm, the court will not enjoin these seven defendants.

Kenyon's only potential misappropriation cause is against Grady Bray for the use of Kenyon's photographs. For two reasons, the court will not interfere: Bray has agreed to return them, and damages are a sufficient remedy.

## 12. Goodwill.

Without having had significant contact with leadership in the client company, an employee may not usually be restricted from activities the company did not train him to do. Kenyon says Malcolm, Crane, Bray, and Disaster have misappropriated the goodwill Kenyon has earned though extensive time, labor, skill, and history. It seeks to enjoin them from profiting from Kenyon's goodwill.

### A. Malcolm and Disaster.

Malcolm is a coroner who coordinated morgue operations and mass-fatality planning for Kenyon. In his three-year association with Kenyon, he worked on fewer than three projects

a year. Kenyon has no evidence that Malcolm established relationships with its customers' decision makers. It has not shown that Malcolm had any contact, much less close contact, with the leaders of its clients. Malcolm never worked in a capacity where Kenyon's goodwill would have attached to him. Clients did not choose Kenyon because they associated it with Malcolm.

Kenyon has no complaint if Disaster, through Malcolm, is able to attract clients because Malcolm has experience with Kenyon. Malcolm did earn additional mass-fatality experience at Kenyon, but that marginal accretion of experience is not something Kenyon may keep to itself. Nor may Kenyon enjoin Malcolm from inflating his resume - if he did. Because Malcolm did not represent Kenyon, neither Malcolm nor Disaster is vested with Kenyon's goodwill.

B. *Crane.*

Kenyon hired Crane to write mass-fatality plans for two specific clients. Crane never recruited clients or developed a working relationship with them, nor does Kenyon say that he did.

To the extent Crane has goodwill, it is his own. Crane has spent his entire career in emergency services, managing other businesses and teaching emergency-response skills. The goodwill Crane has is the professional goodwill that has attached to him personally as a result of his expertise and accomplishments.

C. *Grady Bray.*

Kenyon hired Bray because he was already prominent in the field of emergency-services counseling. Bray was the principal of his own firm, Bray Associates, for sixteen years before he joined Kenyon. In fact, Kenyon recognized in the consulting contract that Bray had already developed and branded his work.

Bray's term as a vice president for Kenyon ended in September 2006. From October 2006 to September 2009, Bray was a consultant. Kenyon has not shown that Bray developed close relationships – or that he even had contact – with the leader's of Kenyon's clients. Without evidence that Bray was the face of Kenyon and attracted it clients, he possesses none of Kenyon's goodwill. From the facts presented, Bray, like Crane, has an abundance of professional goodwill that is attached to him personally. Any goodwill he has is his own, not Kenyon's.

D.   *No Injunction.*

Malcolm, Crane, and Bray are not representative of Kenyon. Rather, they were occasional contractors with records of personal accomplishments. Kenyon has not demonstrated - or claimed - that any of them had established relationships with the decision makers of its clients while working for Kenyon, nor has Kenyon said it suffered a loss of goodwill when they left. Consequently, they do not possess any Kenyon goodwill, leaving nothing to enjoin.

13.  *Conclusion.*

Based on the contracts and evidence presented, the court will not interfere with the lives of the defendants. Each of Kenyon's injunction requests is flawed.

Kenyon seeks an injunction to protect its economic investment in people and information. This includes the knowledge of its clients acquired by workers that would enable them to divert business from Kenyon to themselves, directly or indirectly. Kenyon has no investment in its workers' apperceptive masses. It recruited trained, knowledgeable technicians. It used them on projects where they mostly responded to storms, earthquakes, and wrecks. These were not opportunities for getting to know decision makers. Clearing bodies from the wreckage after a hurricane abroad does not give a worker an entrée to the minister of the interior.

If a worker had acquired a measure of goodwill in his relation to a client, the need for Kenyon and the others arises from fortuitous, widely-spaced events. The workers cannot shift a book of accounts from Kenyon and serve them on his own like a retail stock broker.

Kenyon sought to enjoin the defendants, especially Bray, from bidding in a government-run auction for a contract. Its argument was that he could possibly do the job without its materials, making his bid either the product of theft or a fraud on the government sponsor. Contracts acquired through public, competitive bidding are not susceptible to the claims of goodwill and experiential affiliation that might be credible in another context. As it turned out, the government did the work itself.

Kenyon is highly unlikely to succeed on the merits of its claims. Kenyon also has not shown that it will be irreparably harmed or that monetary damages will be insufficient to restore it. Because of Kenyon's missing facts for other elements, the court need not balance the harms or consider the public interest, but it is obvious that the harm to the defendants

would be significant, benefit to Kenyon minimal, and the public affected almost none. *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

Signed on February 8, 2010, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge