| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | | SOUTHERN DISTRICT OF TEXAS |

Kenyon International Emergency §
    Services, Inc. §
                                §
        Plaintiff, §
                                §
versus                                   §                  Civil Action H-09-3550
                                §
Mark Malcolm, *et al.*, §
                                §
        Defendants. §

# Opinion on Summary Judgment

1. *Introduction.*

A disaster management company sued its former workers because they took jobs elsewhere. The workers moved for summary judgment. They will prevail. This opinion supplements the opinions and renditions already in the record.

2. *Background.*

The court described this case's factual background in its opinion of February 8, 2010.[1] Kenyon International Emergency Services is a business that responds to mass casualties – hurricanes, airplane crashes, and plant explosions. It manages the response – recovers the bodies, trains local workers, and counsels families and survivors. Because mass casualties are rare, most of its employees are independent contractors. Seven of the eight people it has sued were independent contractors. They had significant experience in their fields before working for Kenyon. Except Grady Bray, all held full-time jobs elsewhere as coroners, nurses, and therapists. Bray had been a psychologist in crisis counseling for sixteen years before joining Kenyon. He worked full time for Kenyon from 2002 to 2006 as a vice president.

In 2009, several independent contractors left or started to work on their own. Upset

---

[1] Docket number 78.

that they were no longer working for it, Kenyon sued eight people plus some of their affiliated companies under eleven legal theories.

On December 2, 2009, and in its opinion of February 8, 2010, this court denied Kenyon's request to enjoin the defendants from competing against it and using its data. Among other factors precluding an injunction, this court found that it was unlikely to succeed on the merits. It appealed and lost.

On June 14, 2010, this court awarded the workers the attorneys' fees they had incurred in defending themselves against Kenyon's attempt to enforce an illegal covenant not to compete. On that day, the court also denied its motion to compel arbitration.

3. *Remaining Parties and Theories.*

On January 4, 2011, the court found and Kenyon conceded that Ronald Crane was never a fiduciary of Kenyon.[2] Six days later, it withdrew its claims under the Theft Liability Act.[3]

On April 7, 2011, the court – on Kenyon's motion – dismissed Marjorie Bray, James Fairbrother, Sharon Fairbrother, and Leah Hawley with prejudice.[4]

The remaining defendants are Mark Malcolm, Ronald Crane, Grady Bray, Kathy Rock, and some of the corporate defendants. The defendants have moved for summary judgment on the remaining issues. The legal theories are:

- Breach of contract
- Misappropriation of trade secrets
- Breach of confidentiality
- Tortious interference
- Conspiracy
- Unfair competition
- Misappropriation of goodwill
- Breach of fiduciary duty
- Lanham Act

---

[2] Docket number 137.

[3] Docket number 144.

[4] Docket number 172.

4.   *Breach.*

Kenyon claims that Malcolm, Crane, Bray, and Rock breached the covenants not to compete and not to solicit.

In the opinion denying the injunction the court held that the covenants not to compete were unenforceable because they were too broad on all three of Texas's statutory measures: time, scope, and geography. Since that time, a deposition of Kenyon's president – Robert Jensen – has shown that it knew that the covenants were too broad when it wrote them; it knew that the restriction could indefinitely prevent a contractor from working anywhere for any competitor. The court declined to reform the covenants, and it declines to reform them now.

In its response to the motion for summary judgment, Kenyon has asked this court to reform the covenants not to compete by limiting them to one year after the court reforms them, making them have three-year terms. To do this, it reads two documents in tandem. Reading them as one document would allow it to graft the 30-day termination notice in the first document to the second document with the covenant not to compete. Kenyon says neither party has given the other notice of termination.

A.   *Standby Agreements.*

Kenyon required its independent contractors to sign a standby agreement called the "Independent Contractor/Consultative Agreement." It was not a contract. Kenyon used the standby agreements to create a list of people it could hire when it needed them to work. Nothing required Kenyon to ever "activate" these people. It gave them nothing in return for their standing by: no money, no information, and no commitment. When it needed workers, it required the person to sign a "Letter of Activation." This letter stipulated the terms of their employment – the pay, tenure, location, and job – and contained the covenants not to compete and solicit.

Malcolm's standby agreement said the parties' relationship could be terminated only with thirty-days written notice. The activation letters, on the other hand, had an express end to the parties' relationship, including the covenants. By grafting the two together Kenyon argues that Malcolm and Crane are still "employed" because neither party has tendered a written notice of termination.

Kenyon says that the consultant's promise not to disclose confidential information created an implied promise by it to disclose confidential information. The forthcoming information, it says, was consideration for the standby agreements.[5]

In the case handed up by Kenyon, the employee agreed to keep the clients' private information confidential as part of his initial employment agreement with an accounting firm. He immediately began work, and he had the clients' information. On his leaving the firm nine years later, the worker claimed that the promise of information was illusory. The court ruled that by having furnished him the information, the employer's promise to do so could not be illusory. The nature of his work required the firm to disclose client information. Furnishing it to the employee in exchange for his promise not to disclose it was sufficient consideration.

That case involved access to client confidences. When the workers agreed to the standby agreement, Kenyon did not implicitly agree to disclose client confidences because it did not yet have clients for the workers. If confidences were to be disclosed, they were in the future and depended on a separate, second contract.

Kenyon disclosed nothing immediately after the standby agreement was signed, nor did it commit to exposing Malcolm or Crane to confidential information. Similarly, Malcolm and Crane had no obligation to work when Kenyon, if ever, offered them an actual job. If it offered Malcolm or Crane a job and they declined, it would have had no recourse against them under the standby agreement. An anticipation of possible work is not work, nor is it an implied promise to furnish secret data under the standby agreement itself. For want of consideration – real or implied – the standby agreements are unenforceable.

Only after the independent contractors signed other agreements called activation letters did Kenyon furnish the data it says is confidential. When it offered them an assignment, it had them sign activation letters. These letters contained their (a) assignment, (b) rate of pay, (c) dates of their work, (d) covenant not to compete, and (e) confidentiality commitment. Nothing in the activation letters suggests that they are anything other than distinct contracts.

Nothing in the text indicates a relationship between the standby agreements and the activation letters. The activation does not say it is an addendum to or modification of the standby agreement. In fact, the differences between the standby agreements and activation

---

[5]*Mann Frankfort Stein & Lipp Advisors, Inc., v. Fielding*, 289 S.W.3d 844 (Tex. 2009).

letters for each of them reinforces their separateness. They have to be separate since the standby agreement is not a contract.

Malcolm's standby agreement enlisted him for his mortuary and search and recovery services. In contrast, the activation letter hired him for his planning – a distinctly different job. The activation letter's non-compete and non-solicitation sections talk only about "this agreement." The activation letter does not suggest that the covenants may be extended by the standby agreement or that they only apply after written notice by either Kenyon or the contractor. Kenyon does not explain how the activation letters could have modified the standby agreements.

Like Malcolm's standby agreement, Crane's does not describe the jobs he will do, the amount Kenyon will pay him, or when it will activate him. Unlike Malcolm's, his standby agreement does refer to the activation letters it will require in the future. It says that he agrees to "perform the assignment(s) set forth in the agreed-to letter of activation" and he will be compensated as described in the "agreed-to letter of activation." At the time the standby agreement was signed, no activation letter existed; the clauses should have said the future, potential, "to-be-agreed-to letter of activation."

Crane's standby agreement is essentially an agreement to agree. At best, the "standby agreement" is a list of rules governing his behavior – including the non-compete – if Kenyon ever offers him a job and if he ever takes it. Neither party actually commits to do anything for the other.

His activation letter is the same form as Malcolm's. In it, the obligations of the parties are described. The confidentiality clauses are repeated, and the covenants not to compete are included. Nothing in the activation letter suggests it is being incorporated into another agreement. Only when he signs the activation letter, does Kenyon expose him to clients or furnish him its manuals – ones that it says are confidential. This is the exchange of data in return for confidentiality. If it had meant to include the thirty-day notice of the other agreement, it would not have described the term of the non-compete as ending one year after the termination of "this Agreement." Nothing in the activation letter suggests that the bounds of each parties' obligations are not exclusively within it. A contracting party may not vary a complete contract with clauses from another distinct contract.[6]

---

[6] *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958).

Kenyon offered no coherent analysis of how the two documents are physically or rationally one. The same general subject does not merge them. The standby agreements cannot be enforced on their own because no consideration was exchanged for them – in reality or by implication. The standby agreements are unenforceable and were not modified by the activation letters. The thirty-day notice is empty.

### B. Modification and Time.

In October of 2009, Kenyon sued Malcolm, Crane, and everyone associated with them. Despite this, Kenyon claims that Malcolm and Crane are still its employees because neither side has given the other a termination notice. When Kenyon sued them in 2009, they were no longer working at Kenyon and were not being paid by it. Assuming that the standby agreements were enforceable, Kenyon's claim depends on the theory that the activation letter modified the standby agreement – that the two merged. With this interpretation Kenyon would like the court to reform them to run for one year beginning from the date of the court's reformation, rather than on the date of the suit. If the one-year period began on the date of the suit, it would have expired by now.

### C. Long Past.

Even if the court assumes that the activation letter modified the standby agreement, requiring a thirty-day termination notice, Kenyon terminated Malcolm and Crane's employment by suing them in state court in October of 2009 and again in this court on November 2, 2009. Whatever working relationship they may have had unequivocally ended at that time. In its complaint, Kenyon – with no facts – accused them of unlawful behavior. By suing them under ten different legal violations and demanding an injunction and attorney's fees, Kenyon demonstrated that it no longer trusted them. The message was clear: their relationship with Kenyon was over. Kenyon announced that they were gone. They were traitors, and it would crush them.

If the court had reformed the covenants not to compete, the time for them not to compete would have been limited to no more than one year from the date of the injunction hearing on December 2, 2009. That year has since passed.

D.  *No Harm.*

Kenyon says that Malcolm, Crane, Rock, and Bray violated their covenants not to compete. The covenants have not changed since this court's opinion denying the injunction. As discussed there, they are too broad on all three limitations: time, scope, and geography. Because they are too broad, they are unreasonable and unenforceable.

Kenyon says that Malcolm, Crane, Bray, and Rock violated their non-solicitation agreements. Kenyon offers no fact suggesting that Rock solicited its employees.

It says that Malcolm, Crane, and Bray violated their non-solicitation agreements when Bray asked its employees to go to American Samoa with Disaster Management when he was still under contract to Kenyon. Kenyon did not bid on that project. Disaster Management did not win the American Samoa contract and never went to the island. Because no employees left Kenyon to go to American Samoa, it suffered no harm.

Kenyon asks the court to reform the covenants. Because Bray and Rock have not worked for it since 2009, reforming the covenants to one year with a narrower scope and geographic restriction would be futile. Because it sued Malcolm and Crane, they did not work for it after November of 2009. Reforming their covenants to one year with narrower limitations would be futile.

Even if the court were to reform the covenants, Texas law prevents recovery of damages until the unenforceable covenant is reformed. Kenyon cannot recover for pre-reform conduct.[7] Since it complains of conduct that happened before a potential reformation, it cannot recover damages from Malcolm, Crane, Bray, and Rock.

5.  *Confidentiality.*

Kenyon says that Malcolm took photographs of overseas bodies and used them in a presentation in violation of his agreement's non-disclosure provision. It also speculates, with no facts, that Malcolm may have taken its manuals or training materials. It has no data – none – that Malcolm took its materials. Even if the court were convinced that a photograph of bodies was a violation of the non-disclosure provision, it has no damage.

---

[7] Tex. Bus. & Com. Code § 15.51(c); *Mann Frankfort*, 289 S.W.3d at 855 (Tex. 2009).

In 2011, Kenyon claims to "now know that they have utilized" confidential information, but it declines to hint to the court what that information was or when it was used. It cannot show that Crane took its confidential information or that Rock breached the non-disclosure provision.

Kenyon sued Bray for doing exactly what his contract allowed him to do. His consulting agreement expressly allows him to use all materials he developed while working for it. Even if he were not allowed to use the pictures and the powerpoint presentation, Kenyon cannot show that it was hurt by their use.

6. *Trade Secrets.*

Kenyon says that Malcolm, Crane, Rock, and Bray took and used its trade secrets. It says that the photograph of dead bodies is a trade secret. It is not.[8] Even if the photograph were an actionable secret, Kenyon has no evidence of injury by Malcolm's use of it.

It says that Bray misappropriated trade secrets by using presentations that include disaster photographs. The photographs are not trade secrets, and it has no injury from their use. After three years, it cannot show that Crane or Rock took and used a trade secret.

7. *Interference.*

Kenyon says that Malcolm, Crane, and Bray tortiously interfered with its prospective business in Washoe County, Nevada, and that Malcolm and Crane tortiously interfered with prospective business in Arkansas.

It had no reasonable probability of winning the Washoe County contract. It was ranked fifth of the six bids; even if Disaster Management had not bid for the contract, Kenyon would not have won. Disaster Management, Malcolm, Crane, and Bray did not interfere with its prospective business with the county.

Kenyon did not ask for and was not asked to do the Arkansas work. Its probability of winning the Arkansas contract was zero, since it did not bid on the work, did not request to do the work, and was not offered the job. Malcolm and Crane could not tortiously interfere with

---

[8] *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991); *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958).

a relationship that could never have existed. Kenyon acts as if it owned all future recovery work, but this is simply a cloak for its raw moves to suppress competition.

8.      *Competition.*

Kenyon says that Malcolm, Crane, Bray, and Rock unfairly competed against it. Kenyon developed manuals, records, and recovery tags, but it cannot show that Malcolm, Crane, Bray, and Rock took them. It has no damages.

Kenyon also says that Disaster Management competes unfairly because its website falsely represents Disaster Management employees' expertise and experience.

If the claim is that Disaster Management overstated its workers' qualifications, it is not Kenyon's to bring. The claim would belong to a client of Disaster Management that relied on the false qualifications when it hired them and the false qualifications were caused its damages.

Even if Kenyon had a claim, it cannot prove that the qualifications were false, that it relied on them, or that they caused it harm. Although Kenyon may not like that the truth is unfair, this is not a legal claim.

9.      *Goodwill.*

Kenyon says that Malcolm, Crane, Bray, and Rock stole its goodwill. Its claim against Rock is unsupported by facts. It says that Malcolm, Crane, and Bray took its goodwill and passed it off as their own on the Disaster Management website, giving them a competitive advantage.

Theft of goodwill is not an independent substantive claim. It is an element of damages for unfair solicitation and competition. Even if it were a claim, they were not imbued individually with its goodwill and did not take its goodwill. The website does not mention Kenyon and no visitor would confuse Disaster Management for it. Like the rest of its legal theories, it is unsupported and misguided.

10.     *Fiduciaries.*

Kenyon says that Malcolm, Crane, Bray, and Rock were its fiduciaries. On January 4, 2011, this court dismissed – and Kenyon conceded – the fiduciary duty claim against Crane. It cannot resuscitate that claim.

A fiduciary duty generally applies to someone who has a "position of peculiar confidence towards another."[9] It involves trust with substantial discretion over a material aspect of another. Every contract implies trust, but not necessarily a fiduciary trust. Robert Jensen – Kenyon's president – swore that a taxi driver who promises to pick him up owes him a fiduciary duty. The men and women he has sued were mid-level recovery managers, trainers, or technicians – the taxi drivers of the disaster management industry.

Malcolm was an independent contractor for Kenyon – he coordinated morgue operations and was a crisis management specialist, a trainer, a team leader, and a planning specialist. Kenyon never gave him the power to be its agent or fiduciary. He could not sign contracts on its behalf. He had no discretionary authority to act for Kenyon. Malcolm was not its fiduciary.

Rock wrote manuals and trained clients for Kenyon. Bray was a consultant who managed disaster services, conducted training, and attended conferences. Neither owed a fiduciary duty to it.

11. *Lanham Act.*

Kenyon says that Malcolm, Crane, Bray, and Rock are spreading information and advertising in a way that will confuse and deceive consumers of Kenyon's services. This is another claim in search of facts that do not exist. It cannot show that they are falsely advertising themselves, that they are causing confusion about their association with it, or that it has been harmed by their marketing misrepresentations.[10] Disaster Management's website does not mention Kenyon, and no consumer would confuse the two.

12. *Conspiracy.*

Kenyon says that the defendants conspired to unlawfully compete against it. It has no evidence of their unlawfully competing against it, an agreement to do anything unlawful, or its consequent damages from anything.

---

[9] *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942); *see also* Black's Law Dictionary 640 (7th ed. 1999).

[10] 15 U.S.C. § 1125 (2006).

13. *Conclusion.*

Kenyon International Emergency Services, Inc., will take nothing from:

| | |
|---|---|
| Mark Malcolm | Grady Bray |
| Ronald Crane | Kathy Rock |
| Marjorie Bray | Leah Hawley |
| James Fairbrother | Sharon Fairbrother |
| Crisis Human Services, Inc. | Bray Associates |
| Disaster Management International Corporation | |

Signed on December 13, 2011, at Houston, Texas.

Lynn N. Hughes
United States District Judge